**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Danny K. SMITH, Defendant–Appellant.**

No. 93–5119.

United States Court of Appeals,
Fourth Circuit.

Argued May 13, 1994.

Decided July 18, 1994.

**ARGUED:** Thomas B. Shuttleworth, II, Shuttleworth, Ruloff, Giordano & Kahle, P.C., Virginia Beach, VA, for appellant. Robert Joseph Seidel, Jr., Asst. U.S. Atty., Norfolk, VA, for appellee. **ON BRIEF:** Kenneth E. Melson, U.S. Atty., Norfolk, VA, for appellee.

Before ERVIN, Chief Judge, MICHAEL, Circuit Judge, and CHAPMAN, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge CHAPMAN wrote the opinion, in which Chief Judge ERVIN and Judge MICHAEL joined.

## OPINION

CHAPMAN, Senior Circuit Judge:

Danny Keith Smith was convicted of making false statements to influence a financial institution in violation of 18 U.S.C. § 1014 (1988) and sentenced to eighteen months incarceration. On appeal, Smith contends that the government failed to prove that he made a misleading statement to a bank as required by the statute and at sentencing the court erred in determining the loss to be in excess of $200,000. We find no errors and affirm.

### I.

Smith was an attorney involved in the real estate development business in southeastern Virginia. In 1987, he incorporated a business known as Hearthside Corporation ("Hearthside"), which was primarily intended to develop, construct and sell residential property. Between May 1987 and January 1988, Hearthside constructed various townhouse properties located in Chesapeake, Virginia, but had trouble selling these properties to qualified homebuyers.

In 1987, Smith met Carol Battles, a representative of Dime Real Estate Services–Virginia, Inc. ("Dime Real Estate"). Dime Real Estate was a fully owned subsidiary of the Dime Savings Bank of New York, F.S.B. ("Dime Savings Bank"), a financial institution insured by the Federal Deposit Insurance Corporation ("FDIC"). Battles discussed with Smith an arrangement for funding low documentation loans or "low doc loans" to potential buyers of Smith's properties. Under this arrangement, Dime Savings Bank would provide 80% financing and quick turnaround approval for qualified buyers who made a 20% down payment.

Smith could not find buyers who would put down 20 percent of the purchase price, but needing money, he arranged for his brother, Barry Smith, and a friend, Phillip Johnson, to buy ten of these properties. Both Barry Smith and Johnson testified that they were told by Smith that no down payment was required at closing. However, Barry Smith and Johnson each signed sales contracts for five separate townhouses at $80,000 apiece and each contract falsely represented that a cash down payment of $16,000 would be paid at settlement. Smith signed the sales contracts on behalf of Hearthside knowing that neither his brother nor Johnson had any intention of making the required cash down payments.

After the sales contracts were signed in September 1987, Smith submitted documentation to Dime Real Estate to establish that a source of funds existed for the required 20% down payment. These source of funds statements were submitted for the purpose of inducing Dime Savings Bank to provide the

loan funding and were false and misleading because they showed that a source of funds would be available for the 20 percent down payment when in fact the funds were not available and Smith knew that neither Barry Smith nor Johnson intended to make the down payments.

A loan closing package was prepared that included the sales contract, financial statements and the source of funds statements. Dime Savings Bank used this material in deciding to fund the loan. A necessary part of the certification was the availability of the 20 percent cash down payment. After approving the loan closing package, Dime Real Estate contacted Dime Savings Bank which transferred the loan funds, which were used to close the ten sales.

At closing on February 1, 1988, Smith had his law and real estate partner, William Powers, sign a Housing and Urban Development ("HUD") statement showing that there had been a cash down payment when in fact no cash was paid. Among the loan closing documents was the mortgage assignment showing that Dime Savings Bank was funding the mortgage and the mortgage would eventually be assigned to the bank.

At closing, the property was transferred to the straw purchasers, Barry Smith and Phillip Johnson. Although Johnson and Barry Smith later deeded the properties back to Smith, they discovered that they were responsible for making the mortgage payments.[1] They defaulted and the properties were foreclosed upon and sold. Dime Savings Bank lost between $220,000 and $454,000.

On August 12, 1992, Smith was indicted on one count of bank fraud in violation of 18 U.S.C. § 1344, four counts of false statements to influence a financial institution in

violation of 18 U.S.C. § 1014, one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A), and two counts of wire fraud in violation of 18 U.S.C. § 1343 in connection with the loans made by Dime Savings Bank. Smith pleaded not guilty and was tried by a jury. The jury found Smith guilty on the four counts of making false statements to influence a financial institution[2] and acquitted him of the other charges. Smith was sentenced to eighteen months imprisonment.

## II.

### A.

■ Smith contends that his conviction should be reversed because the Government failed to demonstrate that his false statements were made to a bank, as required by 18 U.S.C. § 1014.[3] This is a legal question of statutory construction which we review *de novo*. *United States v. Oloyede*, 982 F.2d 133, 135 (4th Cir.1992).

Smith directs our attention to *United States v. Bonnette*, 663 F.2d 495 (4th Cir. 1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982), and *United States v. Bales*, 813 F.2d 1289 (4th Cir.1987), in which we stated that the essential elements of a Section 1014 violation were: (1) that defendant made a false statement to a bank; (2) for the purpose of influencing the bank's actions; (3) the statement was false as to a material fact; and (4) defendant knowingly made the false statement. *Bales*, 813 F.2d at 1293; *Bonnette*, 663 F.2d at 497. In these cases, false statements were made directly to the banks for the purpose of influencing the bank's actions, and the issue of whether a false statement made to someone other than a bank with the intention that

---

1. Although the properties were transferred back to Smith, the deeds were not properly recorded with the clerk of court for several months.

2. While the scheme involved the sale of ten different properties, these counts of the indictment only included the sales of property at 3356 Bangor Crescent East to Barry Smith and 3360 Bangor Crescent East to Phillip Johnson.

3. 18 U.S.C. § 1014 (1988) provides in pertinent part:

Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance discount, purchase, purchase agreement, repurchase agreement, commitment or loan ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

such false statement influence the bank's action was not before the court. Smith, however, argues that his statements were made directly to Dime Real Estate, which is not an institution that has accounts insured by the FDIC and is therefore outside the scope of § 1014.

In formulating this argument Smith has ignored relevant case law which answers the question squarely and unequivocally. In *Williams v. United States*, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982), the Supreme Court held:

> To obtain a conviction under § 1014, the Government must establish two propositions: it must demonstrate (1) that the defendant made a "false statement or report," or "willfully overvalue[d] any land, property or security," and (2) that he did so "for the purpose of influencing in any way the action of [a described financial institution] upon any application, advance, ... commitment, or loan."

The Court read § 1014 literally to require only that the false statement be made "for the purpose of influencing in any way the action" of a bank. Such a clear holding settles this issue, and we can add nothing that will assist in understanding the meaning of the statute.

First, Smith made false statements on the sales contracts and the HUD statements to obtain the needed funds. Second, Smith testified at trial that he knew that Dime Real Estate and Dime Savings Bank were affiliated and the loans originated at Dime Real Estate were to be subsequently assigned to Dime Savings Bank. Both Barry Smith and Johnson signed documents acknowledging that the loans would be sold to Dime Savings Bank. This acknowledgement was later recorded by Smith as part of the deed and deed of trust package which was completed upon closing of the loan. We need not address whether Dime Real Estate is itself a bank under the meaning of the statute, because Smith knew his statements would influence the action of a bank.

■ In keeping with *Williams* and the language of the statute, we now hold that § 1014 requires proof of a knowingly false statement or report made to anyone for the

purpose of influencing the action of a bank. Smith's violation of this statute is manifest from the record.

### B.

■ Smith also contends that there is not sufficient evidence to sustain his conviction under 18 U.S.C. § 1014. Specifically, he claims there was no evidence that he made false statements to Dime Real Estate because there was no arrangement between Smith and Dime Real Estate that the cash down payments would be made at closing. We review the record for substantial evidence, direct or circumstantial, which taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt. *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir.1982).

As noted earlier, the government must demonstrate that the defendant knowingly made a "false statement or report" for the purpose of influencing in any way the action of a protected financial institution. *Williams v. United States*, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982).

The sales contracts and the HUD settlement statements, which were all signed by Smith, indicated that money was to be paid at closing and Smith knew this money was not to be paid. Smith has offered no explanation for the false information contained in the submitted documents. These statement were made to induce Dime Savings Bank to make the loans and as a result of the false statements, Dime Savings Bank did indeed fund the mortgage loans. This evidence was uncontroverted and substantiates Smith's conviction under 18 U.S.C. § 1014.

### III.

■ Smith argues that the government's estimate on the amount of Dime Savings Bank's loss was speculative and should not have been considered by the district court. Under § 2F1.1, comment n. 8 of the Sentencing Guidelines, the district court is instructed to calculate "a reasonable estimate of the range of loss." The district court's findings

as to the amount of loss suffered by a party is a finding of fact that we review for clear error. *See United States v. Daughtrey,* 874 F.2d 213, 217–18 (4th Cir.1989).

At sentencing, the district court applied Note 7(b) of § 2F1.1, which directs the court to consider the actual loss and not the amount of the loan itself, and found Dime Savings Bank's loss to have been between $200,000 and $500,000. The government argued that Dime Savings Bank had sustained a loss of $45,484.48 for each of the ten town houses, for a total loss of $454,844.80. This loss was established as follows:

Original loan per townhouse $64,000.00

Principal Balance $63,959.18

Interest accrued $12,777.22

Late charges $748.08

Costs for each townhouse $77,484.48

Sale price of each townhouse $32,000.00

Loss for each townhouse $45,484.48

Total loss $454,844.80

Under the sentencing guidelines, a fraud conviction carries a base offense level of six and a loss in the range of $200,000 to $500,000 increases the base offense level by 7 for a total of 13. Although Smith admitted at trial that the bank's loss exceeded $200,000 and his attorney argued at sentencing that the loss exceeded $200,000, Smith now contends that the 1099A forms submitted by Dime Savings Bank to the Internal Revenue Service at the time of resale showed no loss on the sale of the properties. However, a 1099A form is generated to reflect the gross transaction amount as the basis for establishing a capital gain or loss on a sale. The form does not reflect any loss or gain by the bank at the time the form was submitted. We find the district court's conclusion on the amount of loss suffered by the bank was not clearly erroneous.

Smith maintains that he should only be held accountable for the amounts associated with the two loans for which he was convicted. However, under 1B1.3(a)(2) of the Sentencing Guidelines, the district court is allowed to consider conduct which was part of the same course of conduct or common scheme or plan. There is no doubt that the ten loans orchestrated by Smith were for related properties on the same street, and signed the same day for which the loan closings were conducted simultaneously.

## IV.

For the foregoing reasons, Smith's conviction and sentence are

*AFFIRMED.*