**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 95-5181

WALTER EUGENE HOFFMAN,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(CR-94-17-R)

Argued: February 2, 1996

Decided: August 20, 1996

Before WILKINSON, Chief Judge, and RUSSELL and
MURNAGHAN, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Barry Michael Tatel, KEY & TATEL, Roanoke, Virginia,
for Appellant. Thomas Ernest Booth, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:**
Robert P. Crouch, Jr., United States Attorney, Thomas L. Eckert,
Assistant United States Attorney, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Walter Eugene Hoffman was convicted of conspiracy to misapply bank funds, misapplication of bank funds, making a false statement in a bank record, making a false statement on a loan application, and money laundering. He has appealed his convictions on sufficiency of the evidence grounds. We conclude that the evidence was sufficient to support his convictions and affirm the judgment of the district court.

I.

Hoffman was the president of Direct Consumer Marketing, a marketing catalog business in Salem, Virginia, and of Hill Brothers, a mail-order shoe company in Lynchburg, Virginia. Hoffman's convictions arose from his serving as a nominee borrower for Richard Hess, a real estate developer in western Virginia.

In 1985, Hess applied for a commercial loan from First Virginia Bank in Roanoke, Virginia, to finance his real estate projects. Thomas Hartman, a vice-president of the bank, rejected Hess' application because of Hess' poor credit history and the risk of the real estate projects. In 1986 or 1987, Hess offered Hartman money to approve loans to nominee borrowers who would then transfer the loan proceeds to Hess. Hartman agreed to participate in this illegal scheme. Hess paid Hartman $40,000 for approving various loans, and he paid each nominee borrower $1,000 per loan.

In May 1988, First Virginia Bank officials raised questions about Hartman's loans. Rather than answer them, he resigned his position and became a vice-president and loan officer at First Security Bank, a federally insured institution. At First Security Bank, Hartman continued making nominee loans to Hess. When Hess failed to repay the

2

nominee loans, Hartman made additional nominee loans to new borrowers to repay the earlier loans.

Hoffman became embroiled in Hess' scheme in 1989, when Bruce Welch--an investor in Hoffman's companies and a business associate of Hess--asked Hoffman to become a nominee borrower for Hess in the amount of $50,000. On February 21, 1989, Hoffman and Welch went to Hartman's office. Because Hartman's lending limit was only $25,000, Hoffman could serve as the nominee borrower for only half of the desired amount. Hoffman signed a $25,000 promissory note, and Hartman issued a $25,000 check payable to Welch, who then transferred the funds to Hess. Hartman testified at trial that he informed Hoffman and Welch that the nominee loan scheme was illegal.

Hoffman then recruited Frank Thompson, another investor in Hoffman's companies, to serve as a nominee borrower. Hoffman drove him to the bank, where he signed a $25,000 promissory note, which was deposited in Welch's account. That day, Welch transferred $50,000 to Hess' bank account.

In April 1989, when the notes came due for repayment, Hartman made two nominee loans to third parties to repay the amounts owed by Hoffman and Thompson. The new nominee borrowers transferred the loan proceeds to Welch, who deposited the checks in the bank account of one of Hoffman's businesses. Hoffman then issued a check to First Security Bank to pay off his promissory note, and he wrote another check to cover Thompson's promissory note.

In July 1989, Hartman persuaded Hoffman to obtain a second nominee loan for Hess by offering him a $50,000 line of credit for his businesses.[1] This time, Hartman took more care to make the loan look legitimate because First Security Bank's president was approving Hartman's loans. Hartman made the loan in the amount of $23,000 because a more obvious amount such as $25,000 would raise more suspicion. Hartman also explained that they needed to state a purpose

_____

[1] Despite Hartman's promise to extend Hoffman a $50,000 line of credit, First Security Bank subsequently rejected Hoffman's credit application.

3

for the loan that would not arouse suspicion. Hoffman told Hartman to state on the application that he was borrowing money to renovate the pool and heating unit at his Michigan home prior to its sale. When the bank president came to Hartman's office to approve the loan, both Hoffman and Hartman explained that the loan proceeds would be used to renovate Hoffman's house. The bank president orally approved the loan. Hoffman signed a $23,000 promissory note, which stated that the loan was for "personal use."

Hoffman deposited the $23,000 check into the checking account of one of his businesses. He then wrote a check for $19,000 payable to one of Hess' companies. Hoffman kept the remaining $4,000 in his company's account. When Hoffman's note became due, Hartman again made a nominee loan to a third party to repay Hoffman's loan. After obtaining the loan, the third party wrote a $20,000 check to Hartman, who deposited it in Hoffman's business checking account. Hoffman then wrote a check in the amount of $23,535.93 to First Security Bank to repay his loan with interest.

For each of the fraudulent loans that Hoffman made, he was charged with conspiracy to misapply bank funds, misapplication of bank funds, false entry in a bank record, false statement on a loan application, and money laundering. Regarding the five counts pertaining to the February 1989 loan, the district court dismissed before trial the count of false statement on a loan application, and the jury acquitted on the remaining four counts. The jury, however, convicted Hoffman on all five counts relating to the July 1989 loan. The district court sentenced Hoffman to five concurrent sentences of 24 months imprisonment and two years' supervised release. Hoffman appeals the convictions.

II.

We review in turn the sufficiency of the evidence supporting each of Hoffman's five convictions. To sustain a conviction, the evidence viewed in the light most favorable to the government must be sufficient for a rational jury to find the essential elements of the crime beyond a reasonable doubt. United States v. Brewer, 1 F.3d 1430, 1437 (4th Cir. 1993).

4

A.

The elements for the crime of misapplication of bank funds in violation of 18 U.S.C. § 656[2] are the following:

> 1. The bank is federally insured.
>
> 2. The defendant is a bank officer.
>
> 3. The defendant misapplied bank funds . . .
>
> 4. willfully and . . .
>
> 5. with intent to injure or defraud the bank.

United States v. Duncan, 598 F.2d 839, 858 (4th Cir.), cert. denied, 444 U.S. 871 (1979). A scheme of using nominee borrowers to obtain money from a bank for a person who does not otherwise qualify for a bank loan constitutes a willful misapplication of bank funds. United States v. Cyr, 712 F.2d 729, 734 (1st Cir. 1983) (citing United States v. Gens, 493 F.2d 216, 222 (1st Cir. 1974)); United States v. Luke, 701 F.2d 1104, 1107 (4th Cir. 1983) (citing Gens ). The government can establish the element of intent to injure or defraud the bank by proving that the bank officer acted in reckless disregard of the bank's interest. United States v. Brennan, 994 F.2d 918, 922 n.9 (1st Cir. 1993); United States v. Hoffman, 918 F.2d 44, 46 (6th Cir. 1990); United States v. Hansen, 701 F.2d 1215, 1218 (7th Cir 1983).

Hoffman was convicted of misapplication of bank funds as an aider and abettor under 18 U.S.C. § 2. Aiding and abetting the misapplication of bank funds occurs when (1) a bank officer misapplies bank

─────────────────────────────────

[2] At the time of the offense, 18 U.S.C. § 656 provided, in relevant part:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any . . . insured bank, . . . willfully misapplies any of the moneys, funds or credits of such bank . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both . . . .

18 U.S.C. § 656 (1988).

5

funds, (2) the defendant knows of the bank officer's offense, and (3) the defendant acts with intent to further it. United States v. Unruh, 855 F.2d 1363, 1371 (9th Cir. 1987), cert. denied sub nom. Forde v. United States, 488 U.S. 974 (1988).

Hartman misapplied bank funds. He was an officer of First Security Bank, a federally insured institution. He willfully misapplied bank funds by using Hoffman as a nominee borrower to obtain money for Hess, who did not qualify for a bank loan. Hartman also acted in reckless disregard of the injury caused to First Security Bank, namely, the bank's assumption of a loan risk that it would not have undertaken had it known that Hess was the true borrower.

Hoffman aided and abetted Hartman's misapplication of bank funds by serving as the nominee borrower and by making a false statement to the bank president in order to conceal that Hess was the true borrower. Furthermore, Hoffman understood that he was serving as a nominee borrower for Hess, and he knew the illegality of the nominee loan scheme.

Hoffman contends that he did not misapply bank funds because he was legally obligated to repay the loan. Hoffman apparently suggests that he served not as a nominee borrower but as a guarantor of the loan to Hess, who could not otherwise qualify for a loan. Hoffman, however, never disclosed to the bank that he was borrowing the money on behalf of Hess. See United States v. Willis, 997 F.2d 407, 410 n.2 (8th Cir. 1993) (stating that nominee loans are illegal "when the borrower and the bank officer fail to state the real borrower and recipient of the funds, thereby obtaining the loans by means of false pretenses"), cert. denied, 114 S. Ct. 704 (1994). Furthermore, neither Hoffman nor Hartman believed that Hoffman was obligated to repay the loan if Hess could not. The evidence demonstrated that when Hoffman's loan came due, Hartman simply made subsequent loans to other nominee borrowers and transferred those funds to Hoffman so that he could repay the loan.

Hoffman also argues that the misapplication of bank funds did not injure First Security Bank because he repaid his loan in full and with interest. We have held, however, that a "sham" loan has a natural tendency to injure or defraud a bank. Luke, 701 F.2d at 1108. The gov-

6

ernment does not have to show that a bank actually lost money as a result of a misapplication of bank funds. <u>Duncan</u>, 598 F.2d at 858. "[I]t is sufficient that the defendant at least temporarily deprive[d] the bank of the possession, control or use of its funds." <u>Id</u>. The nominee loan to Hoffman injured the bank because Hess obtained the use of the bank's money for two months, although the bank would not have approved the loan had it known that Hess was the true borrower. The fact that Hoffman repaid the loan in full and with interest is no defense to the offense of misapplication of bank funds.

We conclude that the evidence was sufficient to convict Hoffman for aiding and abetting the misapplication of bank funds.

B.

The elements of conspiracy to misapply bank funds in violation of 18 U.S.C. § 371**3** are the following:

> 1. an agreement between two or more persons to act together in committing an offense against the United States (in this case, to misapply bank funds); and

> 2. the commission of an overt act in furtherance of the conspiracy.

<u>See United States v. Chorman</u>, 910 F.2d 102, 109 (4th Cir. 1990). To sustain a conspiracy conviction against an individual defendant, the government must demonstrate more than the mere existence of a conspiracy; the evidence must also show that the defendant understood the purpose of the conspiracy and took some action indicating his participation. <u>Id</u>.; <u>United States v. Laughman</u>, 618 F.2d 1067, 1075 (4th

_____

**3** At the time of the offense, 18 U.S.C. § 371 provided, in relevant part:

> If two or more persons conspire either to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371 (1988).

Cir.), cert. denied, 447 U.S. 925 (1980). Nonetheless, the defendant's participation in the conspiracy need not be extensive. "Once it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 505 U.S. 1228 (1992).

The evidence demonstrates the existence of a conspiracy, which began when Hartman agreed to make nominee loans for Hess. Hoffman joined the conspiracy when he agreed to serve as a nominee borrower. Hartman made the nominee loan to Hoffman, who delivered the funds to Hess. Thus, the members of the conspiracy not only committed an act in furtherance of the conspiracy, but they completed the whole offense.

Hoffman understood the purpose of the conspiracy: he knew that he was serving as a nominee borrower for Hess, and that the nominee loan scheme was illegal. Moreover, Hoffman participated in the conspiracy: he served as a nominee borrower for Hess, made a false statement to the bank and the bank president to conceal that Hess was the true borrower, and delivered the proceeds of the loan to Hess.

Therefore, we conclude that the evidence was sufficient to convict Hoffman of conspiracy to misapply bank funds.

C.

The elements of the crime of false entry in a bank record in violation of 18 U.S.C. § 1005[4] are the following:

_____

[4] At the time of the offense, 18 U.S.C. § 1005 provided, in relevant part:

> Whoever makes any false entry in any book, report, or statement of [an insured] bank . . . with intent to injure or defraud such bank . . . or to deceive any officer of such bank . . . .

* * *

> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1005 (1988).

8

1. The entry was false.

2. The defendant made the false entry . . .

3. knowing that the entry was false, and . . .

4. with intent to injure or defraud the bank or to deceive a bank officer.

United States v. Campbell, 64 F.3d 967, 974 (5th Cir. 1995). Hoffman was convicted of making a false entry in a bank record as an aider and abettor under 18 U.S.C. § 2.[5] Aiding and abetting a false entry in a bank record occurs when (1) someone other than the defendant makes a false entry in a bank record, (2) the defendant took an action that contributed to and furthered the offense, and (3) the defendant intended to aid its commission. See United States v. Walser, 3 F.2d 380, 388 (11th Cir. 1993); Unruh, 855 F.2d at 1371.

Hartman made a false entry in a bank record. Hartman falsely stated on the loan application that Hoffman was borrowing money for the purpose of renovating his house. He knew that the real purpose of the loan was to provide funds for Hess. In making the false statement, Hartman acted with reckless disregard of the injury caused to the First Security Bank, that is, the bank's assumption of a loan that it would not have made had it known that Hess was the true borrower. Hartman also made the false entry with intent to deceive the bank president, who would not have given his approval had Hartman revealed the true purpose of the loan.

_____

[5] It is not clear whether 18 U.S.C. § 1005 applies directly to Hoffman, who was not an officer or employee of a bank. Although the plain language of § 1005 does not require the defendant to be a bank officer or employee, the Third Circuit has held that "the legislative history of § 1005 shows that Congress intended the statute to apply only to bank insiders or their accomplices," and not to bank customers acting on their own. United States v. Barel, 939 F.2d 26, 38-41 (3d Cir. 1991). No other circuit has yet decided whether § 1005 requires that the false entry in bank records be made by a bank officer or employee. We need not decide this issue now because Hoffman was convicted under 18 U.S.C. § 2 for aiding and abetting the false entry in a bank record made by Hartman, who was a bank officer.

9

Hoffman contributed to and furthered Hartman's false entry on the loan application. According to Hartman's testimony at trial, which the jury apparently credited, Hoffman invented the idea of stating that the purpose of the loan was to renovate his house, and he repeated the false statement to the bank president. Furthermore, Hoffman acted with the requisite intent. As Hartman filled out the loan application, he explained to Hoffman that they needed to state a legitimate purpose for the loan in case the bank officers reviewed the loan file. Thus, Hoffman knew that Hartman was making a false entry on the loan application, and he contributed to it.

Hoffman's reliance on United States v. Barel, 939 F.2d 26 (3d Cir. 1991), is misplaced. In Barel, the defendant opened a bank account under a false name and social security number to conceal his assets from his ex-wife. Employees of the bank then recorded the false name and social security number on bank documents, but these employees did not know that they were making false entries into bank records. After the Third Circuit held that § 1005 did not apply directly to the defendant because he was not an officer or employee of the bank, id. at 41, it considered whether he could be convicted as an aider and abettor notwithstanding the fact that he acted alone. The Third Circuit held that the defendant could not be convicted as an aider and abettor because the defendant did not lie about his name and social security number with the specific intent of making the bank employees enter false statements in bank records; the defendant merely intended to defraud his wife. Id. at 42-43.

Relying on Barel, Hoffman argues that he did not act with the specific intent of making Hartman enter a false statement on the loan application, but instead acted for the sole purpose of receiving a $50,000 line of credit from First Security Bank. Hoffman's reliance on Barel fails, however, because Hoffman did not act alone. He served as an accomplice to Hartman, who intentionally made a false entry on the loan application. Hoffman knew that Hartman intended to make a false entry on the application, and he participated willingly. Although Hoffman's desire for a line of credit ultimately motivated him to assist Hartman, he nevertheless acted with the specific intent to aid Hartman in completing the offense.

10

We therefore conclude that the evidence was sufficient to convict Hoffman for aiding and abetting the making of a false entry in bank records.

D.

The elements for the offense of making a false statement on a loan application in violation of 18 U.S.C. § 1014 **6** are the following:

> 1. The defendant made a false statement . . .
>
> 2. for the purpose of influencing the actions of a bank.
>
> 3. The statement was false as to a material fact. And,
>
> 4. The defendant knowingly made the false statement.

United States v. Smith, 29 F.3d 914, 916-17 (4th Cir.), cert. denied, 115 S. Ct. 454 (1994).

The evidence is sufficient to demonstrate that Hoffman made a false statement on his loan application form. The form falsely stated that the purpose of the loan was the renovation of Hoffman's house in Michigan, although Hoffman actually planned to give the money to Hess. Hoffman argues that he did not make the false statement. However, Hartman testified that he explained to Hoffman that they needed to state a legitimate purpose for the loan so as to not attract suspicion, and that Hoffman invented the story about the renovations to his house. The jury apparently credited Hartman's testimony. The fact that Hartman physically wrote out the form does not alter the conclusion that Hoffman made a false statement on the loan application.

_____

**6** At the time of the offense, 18 U.S.C. § 1014 provided, in relevant part:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of[an insured bank] upon any application . . . or loan . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.

The evidence is also sufficient to demonstrate that Hoffman made the false statement for the purpose of influencing the bank. Hoffman contends that the false statement did not influence the bank's decision to make the loan because no bank official other than Hartman (who was working with Hoffman) looked at the loan application form. Nevertheless, Hoffman needed to complete a loan application form to make the loan look legitimate. Hoffman made the false statement for the purpose of minimizing suspicion in the event that the loan was reviewed.

Furthermore, the evidence sufficiently demonstrates that Hoffman made the false statement knowingly. Hartman explained to him that they needed to state a purpose for the loan that would not attract suspicion. Hartman asked for a lie, and Hoffman willingly provided one.

The district court erred, however, in failing to instruct the jury on the issue of materiality.**7** Instead, the district court made its own determination that Hoffman's false statement was material. Although Fourth Circuit law at the time of trial required the district court to determine the issue of materiality on its own, see United States v. Whaley, 786 F.2d 1229, 1231 (4th Cir. 1986), the Supreme Court subsequently held in United States v. Gaudin, 115 S. Ct. 2310, 2320 (1995), that the element of materiality must be submitted to the jury.**8**

Because Hoffman did not object at trial to the district court's failure to instruct the jury on the element of materiality, we review under the plain error standard. To correct an error not raised at trial, we must find that (1) an error was committed, (2) the error was plain, and (3) the error affected the defendant's substantial rights. United States

_____

**7** The government argues that materiality is not an element of an offense under 18 U.S.C. § 1014 because the plain language of the statute does not require the false statement to be material. Nevertheless, we have repeatedly included materiality as an element of an offense under 18 U.S.C. § 1014, e.g., Smith, 29 F.3d at 916; United States v. Whaley, 786 F.2d 1229, 1231 (4th Cir. 1986), and we do not alter that formula here.

**8 Gaudin** involved the element of materiality in the context of the offense of making a false statement to a governmental agency in violation of 18 U.S.C. § 1001, a statute that parallels the statute under which Hoffman was convicted.

12

v. Olano, 507 U.S. 725, 730-32. Once these threshold requirements are satisfied, we must also determine whether the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Young, 470 U.S. 1, 15 (1985)).

We held in United States v. David, 83 F.3d 638 (4th Cir. 1996), that a district court's failure to instruct the jury on the element of materiality meets the threshold requirements of plain error. In David, the defendant was charged with one count of making a false statement to a governmental agency in violation of 18 U.S.C.§ 1001, a statute similar to the one under which Hoffman was convicted. Because the trial occurred before the Supreme Court issued its decision in Gaudin, the district court, following Fourth Circuit law at the time of trial, made its own determination that the allegedly false statement was material. In light of Gaudin, we held the district court's failure to instruct the jury on the element of materiality constituted an obvious error. Id. at 641. We also concluded that the error was "plain," despite the fact that it was not clear to the district court at the time of trial and became clear on appeal only because the applicable law had been clarified. Id. at 641-46. Finally, we held that the failure to instruct on an element of the crime, where that element cannot be inferred from the other elements actually found by the jury, affects the defendant's substantive rights. Id. at 646-47. Following our reasoning in David, we therefore conclude that the district court's failure to instruct Hoffman's jury on the element of materiality meets the threshold requirements of plain error.

Even where the threshold requirements of plain error are satisfied, an appellate court should exercise its discretion to correct the error only if the failure to do so would seriously affect the fairness, integrity, or public reputation of judicial proceedings. Olano, 507 U.S. at 730-32. In the instant case, the fairness, integrity, and public reputation of our judicial system do not demand that we correct the district court's failure to instruct the jury on the element of materiality. Hoffman was convicted on five separate counts and received concurrent sentences of 24 months in prison. Vacating this conviction would not alter his term of imprisonment or benefit Hoffman in any tangible way. For this reason, we refuse to exercise our discretion to correct

13

the district court's failure to instruct the jury on the issue of materiality.

E.

The elements of the crime of money laundering in violation of 18 U.S.C. § 1957(a)[9] are the following:

> 1. The defendant knowingly . . .
>
> 2. engaged in a monetary transaction . . .
>
> 3. involving criminally derived property . . .
>
> 4. with value greater than $10,000.

United States v. Smith, 44 F.3d 1259, 1270 (4th Cir.), cert. denied, 115 S. Ct. 1970 (1995).

The evidence sufficiently shows that Hoffman engaged in a monetary transaction involving criminally derived property with value greater than $10,000 because he received a $23,000 loan through the misapplication of bank funds and then transferred $19,000 of the loan proceeds to Hess. Hoffman contends only that he did not know that the nominee loan scheme was illegal. Hoffman, however, presents us with a mere conflict in testimony: Hartman testified at trial that he explained to Hoffman that the scheme was illegal, whereas Hoffman testified that he did not know of the illegality of the scheme. We will not review a jury's credibility determinations on appeal. United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994), cert. denied, 115 S. Ct.

_____

[9] At the time of the offense, 18 U.S.C. 1957(a) provided, in relevant part:

> Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be [a punishable offense].

18 U.S.C. § 1957(a) (1988).

14

954 (1995). The jury weighed the evidence and apparently credited Hartman's testimony.

Accordingly, we conclude that the evidence was sufficient to convict Hoffman for money laundering.

III.

For the foregoing reasons, we affirm all of Hoffman's convictions.

AFFIRMED

15